# THE STATE OF NEW HAMPSHIRE

# SUPREME COURT

**In Case No. 2014-0254, <u>State of New Hampshire v. David Larose</u>, the court on October 9, 2015, issued the following order:**

Having considered the briefs and oral arguments of the parties, the court concludes that a formal written opinion is unnecessary in the case.

The defendant, David Larose, appeals his convictions for possession of a controlled drug and transporting drugs in a motor vehicle, <u>see</u> RSA 318-B:2, I (2011); RSA 265-A:43 (2014), arguing that the Superior Court (<u>Delker</u>, J.) erred in denying his motion to suppress evidence obtained as a result of a traffic stop. The defendant contends that the court erred because: (1) the scope of the stop was impermissibly expanded; and (2) the warrantless canine sniff of his vehicle was an unreasonable search. We vacate the suppression order and remand.

We set forth the following abbreviated facts as recited in the trial court's order. On March 3, 2013, State Trooper Harrington was on patrol in the Salem rest area of Interstate 93, a location he knew from training and experience to be a high crime area. Harrington testified that people who purchase drugs in Massachusetts often stop at the Salem rest area to use them.

While patrolling the rest area, Harrington observed a vehicle with New Hampshire license plates parked far from the facilities and other cars which, in his experience, was unusual. Harrington noticed that the vehicle did not display an inspection sticker, and he observed no passengers inside. While conducting a computer check of the vehicle's license plate number, Harrington saw a man, later identified as the defendant, get out of the vehicle, walk past the "rest area," and return to the vehicle. The defendant opened the vehicle door, put on a "button-up" shirt, and drove out of the rest area. Harrington followed the vehicle as it re-entered Interstate 93. The defendant then exited the highway at a speed twelve miles per hour over the posted speed limit. Harrington activated his emergency lights, and the defendant pulled over in a mall parking lot.

Harrington approached the vehicle and asked for the defendant's license and registration. As the defendant handed them over, Harrington noticed track marks on his hands. Harrington then asked the defendant if there was "'anything in the vehicle [he] need[ed] to know about,'" to which the defendant responded, "'No, but I do have a license to carry.'"

At some point, Harrington asked the defendant to step out of his vehicle. Harrington sought permission to pat frisk the defendant, and the defendant agreed. After the frisk revealed nothing, Harrington asked for permission to

look inside the vehicle.  The defendant again agreed.  Although Harrington saw no weapons in the vehicle, he observed a "plastic knot" that he believed to be associated with drug packaging.

Harrington then conducted a records check, which revealed nothing of note.  At this time, a second state trooper arrived.  Harrington returned the defendant's license and registration.  Harrington then asked the defendant why he had been at the rest area and about the track marks on his hands.  Skeptical of the defendant's responses, Harrington asked for consent to search the defendant's vehicle.  The defendant declined to give consent.

Harrington then called for the assistance of a drug sniffing dog.  After the dog "alerted" on the van, Harrington explained to the defendant that he would seize the vehicle and apply for a search warrant.  When the defendant stated that he needed the vehicle to get to work, Harrington said that it would expedite the process if the defendant consented to the search.  The defendant signed a written consent-to-search form, and the search uncovered drugs and drug paraphernalia.

The defendant filed a motion to suppress the evidence obtained from his vehicle, which the trial court denied.  Reserving the right to appeal the suppression ruling, the defendant waived his right to a jury trial and was convicted at a trial on stipulated facts.  He now appeals.

When reviewing a trial court's ruling on a motion to suppress, we accept the trial court's factual findings unless they lack support in the record or are clearly erroneous, and we review its legal conclusions de novo.  State v. Dalton, 165 N.H. 263, 264 (2013), cert. denied, 134 S. Ct. 1313 (2014).  The defendant contends that the trial court erred in denying his motion to suppress "because the trooper lacked reasonable suspicion to expand the scope of the stop and because the drug dog entered [his] car."

With respect to the first claimed error, the defendant contends that the trial court erred in finding that the only inquiry Harrington made of him before the frisk was about the contents of his vehicle.  He argues:

> The court erred in failing to find that Harrington's inquiries into Larose's origin, destination, and activities in the rest area occurred during their initial interaction and preceded Harrington's discovery of the plastic knot.  Consequently, the court failed to find that Harrington's initial inquiries not related to the motor vehicle violations were not supported by reasonable suspicion of drug possession.

The trial court's factual narrative does seem to imply that the only question posed to the defendant prior to his being asked for consent to pat frisk was

whether the vehicle contained anything of which Harrington should be made aware. The court's order states:

> Trooper Harrington approached the vehicle on foot, and asked the defendant for his driver's license and registration. As the defendant handed over the documents, Trooper Harrington noticed "track marks" on the defendant's hands. Upon making this observation, Trooper Harrington asked the defendant if there was "anything in the vehicle [he] need[ed] to know about." The defendant replied "No, but I do have a license to carry" which Trooper Harrington believed was a reference to a pistol and revolver permit.
>
> Trooper Harrington asked for permission to pat frisk the defendant and the defendant acquiesced.

(Footnote omitted.)

The trooper's testimony on direct is consistent with this sequence of events. On cross-examination, however, defense counsel indicated that he thought Harrington's testimony was "a little bit different[] than" the narrative in the police report that Harrington wrote shortly after the incident. Counsel asked, "I just wonder if you had the sequence right, because in your narrative you indicate that before that conversation [about the vehicle's contents] takes place, that you ask Mr. Larose about his travels." Harrington responded, "Yes, I probably did" and later stated, "That's accurate." It is unclear whether the trial court discounted or disbelieved Harrington's testimony on cross-examination or simply failed to make a finding on that issue.

Compounding the lack of clarity in the factual timeline is the trial court's failure to address one of the defendant's arguments. In addressing the defendant's contention that Harrington impermissibly expanded the scope of the traffic stop, the court stated: "The defendant first argues that the police impermissibly prolonged the detention by asking the defendant for consent to conduct a pat search and a visual search of the car for weapons." The defendant, however, maintained that the scope of the stop was illegally expanded at an earlier point in time. In his motion to suppress, he argued that "[i]mmediately after requesting Mr. Larose's license and registration, Trooper Harrington unlawfully expanded the scope of the stop by questioning Mr. Larose about his travels that afternoon, and asking why he stopped at the rest area." The trial court neither addressed this argument, nor explicitly determined, as a factual matter, whether at that point in the detention the defendant was questioned about his travels, or his reason for stopping at the rest area.

The scope of an investigatory stop "must be carefully tailored to its underlying justification, must be temporary, and last no longer than is

necessary to effectuate the purpose of the stop." State v. Blesdell-Moore, 166 N.H. 183, 187 (2014) (quotation and brackets omitted).

> To determine whether the scope of an otherwise valid stop has been exceeded by questioning, we must determine whether: (1) the question is reasonably related to the initial justification for the stop; (2) the law enforcement officer had a reasonable, articulable suspicion that would justify the question; and (3) in light of all the circumstances, the question impermissibly prolonged the detention or changed its fundamental nature.

Id. Determination of whether the scope of the stop was impermissibly expanded at the point in time claimed by the defendant requires a determination of what questions were asked of him at that point. Because the trial court did not clearly address this issue, we vacate its suppression order and remand for the court to make or clarify any requisite factual findings and to rule upon the defendant's expansion argument in the first instance.

The defendant also argues that the trial court's ruling that the canine sniff of his vehicle did not require a warrant "appears to be based on an incorrect factual finding that the dog sniff in this case was of the exterior of Larose's car." The court made no factual findings about the canine sniff other than to state that the dog "alerted" on the vehicle. The court did, however, cite federal law for the proposition that "the use of a drug dog to sniff the outside of a motor vehicle does not require a search warrant."

The defendant contends that the police "command[ed] the drug dog to jump in the [vehicle's] window." The State counters that the defendant misinterprets Harrington's testimony and asserts that the dog merely followed the scent into the van. Again, the testimony is not entirely clear. On direct examination, Harrington testified:

> Q  Okay.  So what happened when the K-9 got there?
>
> A  After the K-9 got there, I basically briefed the K-9 handler on the situation and he deployed his K-9 around the vehicle.
>
> Q  And what was the result of that deployment?
>
> A  After the deployment was over, the K-9 officer came up to me and basically said that he had a positive alert on the van.

On cross-examination, Harrington testified:

> Q  And you indicated that you saw at one point the dog was standing on its hind legs and sniffing inside the vehicle?
>
> A  Correct.

4

Q So presumably the driver's window is down, the dog's got his paws up and it's sniffing inside the vehicle, is what it sounds like, right?

A Yes.

Q You then observe the dog jumped into the van and head directly to the middle of the rear seat?

A Yes.

Q So now <u>the police dog is operating at the, you know, the command of his police handler</u>, has now leaped into the vehicle?

A Correct, yeah.

(Emphasis added.)

We leave it to the trial court, which heard the testimony and observed the witness firsthand, to make explicit factual findings as to whether the dog entered the vehicle at the command or behest of its handler and to rule, in the first instance, whether the dog sniff constituted a warrantless search.

<u>Vacated and remanded</u>.

DALIANIS, C.J., and HICKS, CONBOY, LYNN and BASSETT, JJ., concurred.

**Eileen Fox,
Clerk**

5